## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rachelle A. S.,  Case No. 19-cv-1742 (TNL)

   Plaintiff,

v.  **ORDER**

Andrew Saul,
Commissioner of Social Security,

   Defendant.

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 890, Minneapolis, MN 55401; and Karl E. Osterhout, Osterhout Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA 15139 (for Plaintiff); and

Tracey Wirmani, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 340, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Rachelle A. S. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 13, 16. For the reasons set forth below, Plaintiff's motion is denied, and the Commissioner's motion is granted.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in 2016, asserting that she has been disabled since January 1, 2015, due to, among other things, cognitive difficulties, bipolar disorder, and depression.[1] Tr. 12, 62-61, 73-74, 86-87, 97-98. Plaintiff subsequently amended her alleged onset date to June 9, 2016. Tr. 12, 197; *see also* Tr. 58-59, 84-85. Plaintiff's applications were denied initially and again upon reconsideration. Tr. 12, 58-59, 71, 82, 84-85, 96, 107. Plaintiff appealed the reconsideration of these determinations by requesting a hearing before an administrative law judge ("ALJ"). Tr. 12, 125.

The ALJ held a hearing on March 7, 2018. Tr. 12, 32, 34. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. Tr. 1-6. Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 13, 16. This matter is now fully briefed and ready for a determination on the papers.

## III. MEDICAL RECORDS

Plaintiff has a history of depression. *See, e.g.*, Tr. 332-33, 339. She also has a history of marijuana use and being non-compliant with her medications, often due to

---

[1] Plaintiff's assertions of error are limited to the assessment of her mental impairments.

financial resources.  *See, e.g.*, Tr. 332, 337, 339, 342.  Plaintiff has been seeing Robert K. Westin, M.D., for medical care since at least January 2016 and likely well before.  *See, e.g.*, Tr. 332, 361; *see also* Tr. 384 (patient for "at least 14 years"), 418 (patient for 16 years).

### A. 2016

Plaintiff presented to Dr. Westin around the middle of June 2016, feeling like her life was out of control and that "she is 'losing it.'"  Tr. 339.  Plaintiff reported that friends and coworkers "'think [she is] psycho.'"  Tr. 339.  Plaintiff also reported that she had lost a number of jobs over the past two years.  Tr. 339.  Plaintiff felt her emotional well-being had worsened following a car accident two years ago, and she was experiencing "symptoms of fatigue, hypersomnolence, fidgeting and even repetitive twitching of her hands, arms, or legs."  Tr. 339; *see* Tr. 43 (car accident in which Plaintiff went off the side of the road in winter and hit a mailbox, "and the mailbox flipped up and hit [her] driver's side door and window").  Dr. Westin noted that Plaintiff had "previously admitted to smoking marijuana, but denie[d] any harder drugs."  Tr. 339.  Dr. Westin observed that Plaintiff was "[d]isheveled" and "tearful."  Tr. 340.  Dr. Westin prescribed citalopram[2] for Plaintiff's depression; encouraged her to meet with Kenneth G. Fogal, L.P., for psychotherapy; and recommended that she stop smoking marijuana.  Tr. 340.

Plaintiff met with Fogal towards the beginning of August. Tr. 341.  Although Plaintiff was "tearful off and on throughout [the] visit," Fogal noted that she

---

[2] "Citalopram is used to treat depression" and "is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs)."  *Citalopram*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/ meds/a699001.html (last visited Sept. 28, 2020).

3

"demonstrate[d] an improved ability to calm herself with some support and direction."  Tr.
342.  Fogal "had a lengthy conversation [with Plaintiff] about her self-medicating with
cannabis and how that may be significantly affecting her ability to manage [her] current
stressors without any other mood-altering chemical."  Tr. 342.  Fogal recommended a
benzodiazepine[3] on a trial basis "to help manage some of her severe anxiety."  Tr. 342.
Plaintiff's diagnoses were depression, "anxiety as acute reaction to exceptional stress," and
"cannabis use disorder, severe, in early, remission."  Tr. 341.

Plaintiff followed up with Dr. Westin again at the beginning of September with
respect to her depression and anxiety.  Tr. 343, 351.  Plaintiff was "continu[ing] to struggle
with many situational stressors," including losing her job, being behind on bill payments,
and her significant other's incarceration.  Tr. 343; *accord* Tr. 351.  Plaintiff also admitted
that she was not taking her prescribed medications.  Tr. 343-44, 351-52.

Plaintiff was "[t]earful" and "distressed."  Tr. 344; *accord* Tr. 352.  She spoke "in a
halting manner, head slouched on her chest, speech somewhat stuttering and repetitive."
Tr. 344; *accord* Tr. 352.  Plaintiff's PHQ-9 depression screening score was 16, indicating
moderately severe depression.  Tr. 344; *accord* Tr. 352.  Plaintiff's GAD-7 anxiety
screening score was 19, indicating severe anxiety.  Tr. 344; *accord* Tr. 352.

Dr. Westin encouraged Plaintiff to take her prescribed medications, including
lorazepam,[4] "reassur[ing] her that they are not going to make her an addict, which is her

---

[3] *See infra* n.4 and accompanying text.
[4] "Lorazepam is used to relieve anxiety. Lorazepam is in a class of medications called benzodiazepines. It works by
slowing activity in the brain to allow for relaxation."  *Lorazepam*, MedlinePlus, U.S. Nat'l Library of Medicine,
https://medlineplus.gov/druginfo/meds/a682053 html (last visited Sept. 28, 2020).

big concern." Tr. 344; *accord* Tr. 352. Dr. Westin noted that Plaintiff's "poor social situation and non-compliance with treatment will make her high risk for reoccurrence and poor outcomes." Tr. 344; *accord* Tr. 352. Dr. Westin additionally noted that Fogal had completed disability paperwork for Plaintiff and that he agreed with Plaintiff's pursuit of disability benefits. Tr. 343-44, 352.

Plaintiff returned to Dr. Westin approximately one month later. Tr. 353. Plaintiff reported that she had recently been approved for medical assistance. Tr. 353. Plaintiff was "compliant with her medications and . . . feeling like things are somewhat more stable." Tr. 353. Plaintiff also denied "marijuana use as she 'can't afford it.'" Tr. 353. Plaintiff had not been able "to see . . . Fogal consistently because of transportation issues," and was "hoping to get set up with a new therapist . . . closer to home for her." Tr. 353.

Upon examination, Dr. Westin observed that Plaintiff was "[p]leasant, alert, . . . [f]idgety and stuttering somewhat[,] which [wa]s a little more than her normal." Tr. 354. Dr. Westin noted that Plaintiff's PHQ-9 and GAD-7 scores were "still quite high." Tr. 353. Dr. Westin increased Plaintiff's dose of citalopram to assist with her depression and anxiety. Tr. 354.

Towards the end of December, Plaintiff met with Paul Springstead, Psy.D., A.B.P.P., L.P., for a diagnostic assessment clinical interview. Tr. 356. During the interview, Plaintiff reported struggling with depression and feeling "uneasy." Tr. 356. Plaintiff reported significant social stressors, including unemployment, foreclosure, and the incarceration of her significant other. Tr. 356. Plaintiff endorsed feelings of loneliness and sadness and had difficulty sleeping, no appetite, "trouble concentrating," and "no

5

desire to socialize with others." Tr. 356, 359. Plaintiff reported that citalopram was helpful. Tr. 356.

With respect to her employment history, Plaintiff reported that she had been employed by the same company for 14 years and was let go approximately one year ago because her significant other "was in the news for drugs and her boss terminated her because he believed she was using drugs."[5] Tr. 356-57. Since her termination, Plaintiff had worked three different job, each of which she ended after a few months. Tr. 357, 359. Plaintiff cited transportation issues, not having enough time to perform her job duties, and being "offended by comments her coworkers made about her" as reasons for her departures. Tr. 357.

Springstead observed that Plaintiff was appropriately groomed and cooperative. Tr. 357. She was oriented, her thoughts were logical and organized, her speech was clear, and there was no evidence of delusions or hallucinations. Tr. 357-58. Plaintiff's affect was flat. Tr. 357.

Springstead also observed that Plaintiff appeared to exaggerate her symptoms. Tr. 357. Springstead noted that Plaintiff had

> tried to get her late husband's Social Security but failed because they were only married 3 years. At the very end of our session, she mentioned she is going to try for her own disability. Thus, there is a concern she may be malingering to help her obtain disability. Along this line of reasoning, it can be noted she had the maximum score on the GAD-7 which is a self[-]measure of anxiety, the maximum score on the PC-PTSD which is a self[-]measure of PTSD, and the maximum score,

---

[5] At the hearing, Plaintiff testified that she was terminated after she expressed interest in a position previously held by a male employee. Tr. 52.

> except not endorsing she had thoughts of wishing to be dead
> nearly everyday, on the PHQ-9 which is a self[-]measure of
> depression.

Tr. 356.  Springstead listed depression and malingering as working diagnoses.  Tr. 358-59;

*see also* Tr. 359 ("There is a concern about possible malingering . . . .").

### B. 2017

Plaintiff's next appointment with Dr. Westin was towards the end of February 2017.

Tr. 365.  Plaintiff reported being compliant with her medications but continued to

experience stress and uncertainty in connection with her housing situation.  Tr. 365.

Plaintiff continued to abstain from "marijuana or other drugs."  Tr. 365.

Dr. Westin observed that Plaintiff was "[p]leasant," "disheveled," and "mildly

anxious."  Tr. 366.  Plaintiff "ha[d] some response to citalopram," and was instructed to

"minimize the lorazepam use."  Tr. 366.  Dr. Westin noted that Plaintiff had a social worker

that he was going to try to contact.  Tr. 365-66.

Plaintiff met with Springstead approximately twice per month for psychotherapy

between January and March 2017.  *See* Tr. 369-78.  Plaintiff's appearance was noted to be

appropriate initially but became unkempt into March.  *Compare* Tr. 369, 371, 373 *with* Tr.

375, 377.  Plaintiff's affect ranged between constricted and flat.  Tr. 369, 371, 373, 375,

377.  She was consistently noted to be cooperative with a logical thought process and her

memory was intact.  Tr. 369, 371, 373, 375, 377.  Springstead regularly noted that Plaintiff

was unable to stabilize her mood and maintain stable relationships.  Tr. 369, 371, 373, 375.

At the end of January, Springstead referred Plaintiff for adult rehabilitative mental health services ("ARMHS").[6]

Plaintiff's sessions with Springstead often focused on her tumultuous relationship with her significant other, finances, and uncertain housing. *See, e.g.*, Tr. 369, 371, 373, 375, 377. During one session, Plaintiff reported that her significant other "continued to be mean to her dog and then threatened to have his sisters assault her." Tr. 371. Plaintiff called law enforcement, and he was escorted from the residence. Tr. 371. Plaintiff found comfort in her dog and began receiving increased support from her mother and a sister. Tr. 373, 375.

Plaintiff met with an ARMHS worker near the end of March. Tr. 379, 389. Plaintiff "reported that she ha[d] been struggling with her mental health and ha[d] some issues with disability." Tr. 379; *accord* Tr. 389. The ARMHS worker noted that Plaintiff was going to call her social worker about housing resources and "may need some help moving." Tr. 379; *accord* Tr. 389. Plaintiff was also to make an appointment with Springstead. Tr. 379, 389.

Plaintiff met with the ARMHS worker twice more in April. Tr. 390-91. Towards the latter half of April, their session focused on seeking assistance with unpaid utilities and applying for public-assistance programs. Tr. 391. The ARMHS worker noted that Plaintiff

---

[6] "Adult rehabilitative mental health services (ARMHS) are mental health services that are rehabilitative and enable the member to develop and enhance psychiatric stability, social competencies, personal and emotional adjustment, and independent living and community skills when these abilities are impaired by the symptoms of mental illness." *Adult Rehabilitative Mental Health Services (ARMHS)*, Minn. Dep't of Human Servs., https://www.dhs.state mn. us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDoc Name=id_058153 (last accessed Sept. 28, 2020).

"displayed some [mental-health] symptoms when she became stressed about making" a phone call to address the utilities.  Tr. 391.  The ARMHS worker additionally noted that Plaintiff was "becoming overwhelmed with bills and the upcoming foreclosure."  Tr. 391.  Plaintiff "display[ed] confusion about answering questions related to her disability and medical history."  Tr. 391.  She also "ha[d] trouble focusing and change[d] topics."  Tr. 391.

Towards the end of April, Plaintiff met with Fogal, who noted that he had not seen her in almost a year.  Tr. 386-87.  Plaintiff was "[a]nxious" and "depressed."  Tr. 386.  Her thoughts were "[m]ildly disorganized and [she] demonstrate[d] some difficulty articulating her thoughts and feelings along with struggling with some recent memory issues."  Tr. 387.  Plaintiff's behavior was "[a]ppropriate," but "somewhat sedated suggesting she is tired or simply depressed."  Tr. 387.  Plaintiff scored 15 on the PHQ-9, which Fogel noted indicated moderate depression.  Tr. 387.  Plaintiff also "identifie[d] notable anxiety and worry specifically about money and where she is going to be living."  Tr. 387.

Plaintiff spoke about a new relationship and the "'great help'" her social worker was.  Tr. 387.  Plaintiff reported refraining "from any drug use over the past months [sic]."  Tr. 387.  Plaintiff also reported "difficulties with focus and attention and concentration issues along with frequent waking up at night which is causing some destruction of her sleep and potentially then the problems with fatigue and concentration issues during the day."  Tr. 387.  Fogal noted that Plaintiff "claims she has actually been doing fairly well with the anxiety piece but clearly continues to struggle predominantly with a lack of energy

9

and motivation." Tr. 387. Fogel additionally noted that Plaintiff "ha[d], in the past, had numerous no shows . . . and not been reliable in keeping her appointments." Tr. 387. With Plaintiff's commitment "to pursu[ing] regular therapy," Fogel agreed to scheduled three more appointments with her. Tr. 387.

Plaintiff had another four sessions with Springstead between May and June. Tr. 392, 396, 398, 401. Plaintiff's affect was appropriate; she was cooperative; her thought processes logical; and her memory intact. Tr. 392, 396, 398, 401. Plaintiff's affect remained constricted. Tr. 392, 396, 398, 401. Plaintiff enjoyed working with her ARMHS worker. Tr. 392, 396, 398, 401. Springstead continued to note regularly that Plaintiff was unable to stabilize her mood and maintain a stable relationship. *See, e.g.*, Tr. 392, 396, 401.

During these sessions, Plaintiff reported that her new relationship was going well, and she planned to move in with this man. Tr. 392, 396, 398, 401. Plaintiff continued to be comforted by her dog and receive support from her mother, a sister, and a neighbor. Tr. 392, 396, 398, 401. Plaintiff reported experiencing some sadness with regards to her previous relationship and having to move from her home. *See, e.g.*, Tr. 396, 401. She and Springstead also worked on relaxation techniques. Tr. 392, 398, 401. At the end of May, Plaintiff reported concerns over her health and memory. Tr. 398.

During this time and into July, Plaintiff met with her ARMHS worker on four different occasions. Tr. 394, 400, 403, 404. Towards the end of May, the ARMHS worker noted that Plaintiff had "reported minimal [mental-health] symptoms" over the past week, "despite packing her house up for foreclosure." Tr. 394. Plaintiff "reported that she is

coming to terms with her impending move and has started to accept it." Tr. 394. The ARMHS worker observed that Plaintiff "ha[d] done a good job of packing this week." Tr. 394. Additionally, the ARMHS worker noted that Plaintiff "is taking her medications as directed despite feeling better." Tr. 394.

During the next appointment in early June, Plaintiff was having difficulty with her upcoming move. Tr. 400. On a positive note, Plaintiff was receiving "a lot of support, emotionally and financially," in her new relationship. Tr. 400. The ARMHS worker noted that Plaintiff "had a significant problem remembering and staying focused during [the] meeting." Tr. 400.

While Plaintiff again expressed "some depression associated with her home" in July, she also "desire[d] to move forward and be done with it." Tr. 404. The ARMHS worker assisted Plaintiff with arranging for new medical providers following her move and to have her current providers send over her records. Tr. 403-04. ARMHS services were discontinued at the end of July as Plaintiff was moving to another county. Tr. 405; *see* Tr. 400, 403-04.

Near the end of July, Plaintiff met with Sriveer Kaasam, M.B.B.S., M.D., to establish care. Tr. 406. Dr. Kassam noted that Plaintiff was "alert" and "cooperative" with a "healthy appearance." Tr. 408. Dr. Kassam noted diagnoses of anxiety and depression, refilled Plaintiff's medications, and referred her to psychiatry for further management. Tr. 408.

Approximately one week later, Plaintiff was seen by Katherine M. Roberts, A.P.R.N., C.N.P., for a refill of lorazepam. Tr. 450. Plaintiff reported long-standing

anxiety, fidgeting, and difficulty focusing.  Tr. 451.  Plaintiff also "admit[ted] to weekly marijuana use, but denie[d] any additional illicit drugs."  Tr. 451.  Roberts noted that Plaintiff was fidgety, made limited eye contact, and appeared "pretty sedated," at times forgetting what she was saying.  Tr. 451.  Roberts noted that it was "difficult to keep [Plaintiff] on track," and her significant other "frequently sp[oke] for her."  Tr. 451.

Roberts was not comfortable refilling Plaintiff's lorazepam.  Tr. 452.  Roberts noted that while Plaintiff reported taking lorazepam twice per day, this did not match the prescribed dosage.  Tr. 452.  Roberts was concerned about what appeared to be escalated use of lorazepam over the past six months.  Tr. 452.  Given the addictive nature of lorazepam and Plaintiff's sedated presentation, Roberts prescribed "hydroxyzine[7] to take as needed for panic or insomnia," and referred Plaintiff to behavioral health.  Tr. 452, 456, 463, 467.  Roberts also ordered a drug screening.  Tr. 452.  The screening subsequently showed the presence of methamphetamine and marijuana.  Tr. 464-65; *see* Tr. 491.

Roughly six weeks later, about the middle of September, Plaintiff saw Timothy S. Fuchs, A.P.R.N., C.N.P., in psychiatry.  Tr. 416.  Plaintiff's chief complaints were anxiety and renewal of sleep medication.  Tr. 417.  Plaintiff recounted the loss of her employment and recent financial struggles.  Tr. 417.  Plaintiff also reported that, over the past two years, she had begun "to exhibit more jerking type movements in her upper and lower extremities" and a stutter, which worsened with increased anxiety.  Tr. 417.

---

[7] Hydroxyzine can be "used alone or with other medications in adults and children to relieve anxiety and tension." *Hydroxyzine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682866.html (last visited Sept. 28, 2020).

Plaintiff reported that "there have been some improvements in her level of anxiety and her depression," and "[h]er main difficulty at this time is initiating sleep . . . ." Tr. 417; *see* Tr. 418. She described her mood "as 'pretty good lately.'" Tr. 418. Plaintiff additionally reported that hydroxyzine was "very beneficial towards her anxiety." Tr. 417. Plaintiff admitted to using marijuana in the past to "occasionally self-medicate, in some way to help with her anxiety," but had not used it since April. Tr. 418.

Fuchs observed that Plaintiff was alert, oriented, and dressed appropriately. Tr. 418. Plaintiff was cooperative and her thought process logical. Tr. 418. Plaintiff demonstrated adequate attention and concentration and her insight and judgment were fair. Tr. 418. Fuchs observed a "notabl[e] increase in psychomotor activity," including "some jerking type movements in her upper extremity" and "some movements in her oral facial areas." Tr. 418. At times, Plaintiff exhibited a stutter. Tr. 418. Although Plaintiff was tearful during part of the session, she did "not appear excessively restricted or distressed." Tr. 418. Fuchs additionally observed that while Plaintiff "subjectively identifies that her depression and anxiety are much improved[,] . . . this is somewhat incongruent with the PHQ-9 and GAD-7 scores," which showed severe depression and anxiety. Tr. 419, 417. Fuchs continued Plaintiff's citalopram and hydroxyzine and prescribed a trial of trazodone.[8] Tr. 419.

The following day, Plaintiff met with Roberts. Tr. 491. At the time, Plaintiff denied using methamphetamine but did "admit to marijuana use." Tr. 491; *see* Tr. 567 (admitting

---

[8] "Trazodone is used to treat depression." *Trazodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a681038 html (last visited Sept. 28, 2020).

to single use of methamphetamine).  Upon examination, Roberts noted that Plaintiff was anxious and hyperactive, but not depressed.  Tr. 494.  Her speech was "rapid and/or pressured."  Tr. 494.  "She [also] exhibit[ed] abnormal recent memory."  Tr. 494.

Plaintiff next met with Fuchs at the end of October.  Tr. 426.  Fuchs noted that while Plaintiff "initially states that she feels things have been going well," "it is fairly clear that [she] is having considerable difficulty with her anxiety," including excessive worry most days.  Tr. 427.  Plaintiff's son had also gotten into some legal trouble.  Tr. 427.  Plaintiff reported worsening "psychomotor movements and stutter" even during periods of calm.  Tr. 427.  Plaintiff was also "particularly fearful about her memory," reporting "increas[ed] difficulty in this area."  Tr. 427.  Plaintiff's significant other left "numerous notes around the house to reminder her to complete tasks."  Tr. 427.

Plaintiff's PHQ-9 and GAD-7 scores remained the same.  Tr. 427.  Plaintiff was anxious and her affect was more distressed.  Tr. 427.  She also had "several periods of tearfulness" and was mildly distractible.  Tr. 427.  Fuchs continued to observed "evidence of notable psychomotor restlessness, today appears more fidgety," and Plaintiff's "stutter [wa]s much more prevalent."  Tr. 427.  Fuchs prescribed BuSpar[9] for Plaintiff's anxiety.  Tr. 428.

Plaintiff saw Fuchs again in early December.  Tr. 434.  Plaintiff reported that BuSpar was helpful.  Tr. 435.  She felt "much calmer," "had more motivation," and "felt less depressed."  Tr. 435.  Plaintiff also felt "less fearful and less avoidant of being around other

---

[9] BuSpar is a brand name for buspirone, which "is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety."  *Buspirone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a688005.html (last visited Sept. 28, 2020).

people or social situations." Tr. 435.  In addition, Plaintiff "insiste[d] on telling [Fuchs] that, earlier this summer when she was moving, she had broken down and used some methamphetamine when a friend had stopped by." Tr. 435.  Plaintiff stated that she did not use it on a regular basis.  Tr. 435.  Plaintiff admitted that "she periodically will use marijuana approximately once a week, as it makes her 'happy.'" Tr. 435.

Plaintiff's scores on the PHQ-9 and GAD-7 improved a little bit, demonstrating moderate depression and severe anxiety.  Tr. 435.  Fuchs noted that they continued to be "somewhat incongruent to her descriptions." Tr. 435.  Plaintiff continued to have "periods of psychomotor restlessness" and her "[s]tutter remain[ed] prevalent." Tr. 435.  Fuchs noted that Plaintiff "is describing improvement overall," including "improvement in areas of functioning."  Tr. 436.  Fuchs "strongly encourage[d] [Plaintiff] to abstain from continued marijuana use, as this may have long-term effects on mood and anxiety as well." Tr. 436.

The next day, Plaintiff saw Roberts "to discuss paperwork allowing her not to work." Tr. 566.  Roberts noted:

> In the past [Plaintiff] has appeared fairly disheveled.  Usually she is with her significant other.  Today she arrives alone.  She appears disheveled and is rocking very quickly back and forth as well as stuttering and difficult to follow, which is not uncommon from her typical presentation, but certainly worse today.  She states that she has been seeing a provider in Park Rapids.  She is unsure if it is a psychiatrist or neurologist, is unsure what their recommendations are.  She reports that mainly when she gets into public areas she becomes more anxious and stressed out.  It was recommended that she see psychiatry in the past, but she is unsure if she has seen them or not.

Tr. 566; *see* Tr. 567.  Roberts noted that, based on Plaintiff's presentation, "she is not capable of working," and completed a form stating that Plaintiff was unable "to work at least for the next 45 days."  Tr. 567.  Roberts strongly encouraged Plaintiff to consult with neurology and psychiatry.  Tr. 567; *see* Tr. 568, 578.

### C. 2018

Approximately one month later, around the beginning of January 2018, Plaintiff returned to Roberts to discuss disability forms.  Tr. 590.  Roberts noted that, "[w]hen [she] see[s Plaintiff] in the office, it is difficult to determine if she is actually taking her medications and who she is following up as she is unable to provide an accurate history." Tr. 590.  On this occasion, Plaintiff "report[ed] that she thinks she is seeing . . . Fuchs." Tr. 591.  Plaintiff was "very distracted and anxious."  Tr. 591.  Plaintiff spoke rapidly, was "[i]ntermittently tearful," "rock[ed] back and forth in her chair," and "need[ed] frequent redirection."  Tr. 592.  Roberts noted that there was no specific request that she write a letter in support of Plaintiff and advised Plaintiff that such a letter should come from psychiatry or neurology.  Tr. 591.

Plaintiff consulted with neurology in mid-February.  Tr. 604.  Plaintiff reported complaints of fidgeting, memory problems, and "twitching in her sleep."  Tr. 604. Plaintiff's significant other confirmed the twitches and added that Plaintiff "has trouble with daily activities because of her low energy and decreased focus."  Tr. 604.  He also stated that Plaintiff does not often drive "because of [a] hard time with directions" and has gotten "lost [a] few times while driving."  Tr. 604.  During the consultation, Plaintiff reported smoking marijuana "at least 2 times in a week" as it calms her down.  Tr. 605.

16

During the neurologic exam, Plaintiff was noted to have "poor cognition," "decreased" attention, and "intermittent stuttering speech." Tr. 607. The neurologist did not "think any of [Plaintiff's] symptoms [were] secondary to [a] neurological cause," and "could be manifestations of her high anxiety." Tr. 608. The neurologist diagnosed Plaintiff with "[m]ild to moderate cognitive decline," and recommended a CAT scan. The neurologist also advised Plaintiff to stop using marijuana. Tr. 608.

About a week later, Plaintiff had a neuropsychological evaluation. Tr. 626. Plaintiff reported difficulties with stuttering, memory, and maintaining attention. Tr. 626. Plaintiff's "significant other reported that she is easily distracted and that she forgets intentions upon entering a room." Tr. 626. Plaintiff was "currently driving without reported difficulty." Tr. 626. Plaintiff's significant other helped with her medications "by filling a pillbox" and "also assist[ed] with financial matters." Tr. 626. Plaintiff described her current mood as "'anxious and worried,' and cardinal symptoms of depression were noted." Tr. 626. Plaintiff "reported using cannabis approximately two times per week." Tr. 626.

The examiner noted that Plaintiff exhibited "[s]ignificant stuttering . . . at the outset of the interview; however, towards the end of the interview speech was normal." Tr. 626-27. Plaintiff "was quite anxious during the testing session and was slowed in her test-taking behavior; therefore the test battery was shortened." Tr. 627; *see* Tr. 48-49 (testing ended after four hours). Ultimately, the "[r]esults from the neuropsychological evaluation could not be interpreted due to [Plaintiff's] deficient performance on 2 out of 3 measures of symptom validity." Tr. 628; *see* Tr. 627 ("Effort was questionable; therefore, the results

17

of this evaluation are interpreted with caution."). The examiner noted that "[p]oor effort may be due to various factors including significant mood symptoms, chronic pain, fatigue and secondary gain." Tr. 628. The examiner also noted that Plaintiff's "severely deficient performance on testing would not be consistent with [her] reported injuries from a minor car accident 2 years ago." Tr. 628.

## IV. OPINION EVIDENCE

### A. Dr. Westin

#### 1. January 2017 Medical Source Statement

In January 2017, Dr. Westin completed a medical source statement. Dr. Westin listed Plaintiff's diagnoses as depression, "[a]nxiety as acute reaction to stress," and "[c]annabis use disorder, severe, in remission." Tr. 361. Plaintiff's prognosis was "guarded," and "[w]hile some benefit from SSRI [was] noted, she continues to struggle." Tr. 361. Dr. Westin checked "no" when asked if Plaintiff was a malingerer. Tr. 361.

Dr. Westin was asked about Plaintiff's ability to sustain certain mental activities. Dr. Westin opined that Plaintiff was moderately limited but could still function satisfactorily with respect to: understanding, remembering, and carrying out very short and simple instructions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation. Tr. 362.

Dr. Westin further opined that Plaintiff was markedly limited with a substantial loss in her ability to function effectively in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out detailed instructions; working in coordination with, or proximity to, others without being distracted by them; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; responding to changes in the work setting; setting realistic goals or making plans independently of others; and tolerating normal levels of stress. Tr. 362.

Lastly, Dr. Westin opined that Plaintiff was extremely limited and had no useful ability to function in the following areas: maintaining attention and concentration for more than two-hour segments; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; and completing a normal work day and work week, without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. Tr. 362.

Dr. Westin opined that Plaintiff would need additional unscheduled breaks, namely, a five-minute break at least every half an hour. Tr. 363. Dr. Westin further opined that Plaintiff was likely to experience good days and bad days and would be absent from work more than three days per month. Tr. 363. Finally, with respect to Plaintiff's marijuana use, Dr. Westin opined that, "[w]hile [it] contributes to her condition[, it was] not likely that cessation of this would have a significant impact." Tr. 364.

### 2. April 2017 Letter

At the end of April 2017, Dr. Westin provided a letter in support of Plaintiff. Tr. 384-86. Dr. Westin cited Plaintiff's "recent health issues," including "depression, anxiety and situational stressors related to a dysfunctional relationship she was previously involved in and also a history of drug use (primarily marijuana, but also meth)," as bearing on her ability to work. Tr. 384; *accord* Tr. 385. Dr. Westin further stated that Plaintiff "reports difficulty maintaining concentration, being able to complete tasks, lacking energy and motivation," and difficulty sleeping. Tr. 384; *accord* Tr. 386.

Dr. Westin stated that Plaintiff "has been drug[-]free reportedly for several months and her social situation has improved." Tr. 384; *accord* Tr. 385. Dr. Westin opined that Plaintiff "would be unable to sustain a job requiring her to work [eight hours] a day without missing more than [two] days per month." Tr. 384; *accord* Tr. 386. Noting that Plaintiff "has been treated with antidepressant and antianxiety medication[s] which have been marginally helpful," Plaintiff's "prognosis remains unlikely that she would improve enough to be able to maintain a steady job." Tr. 384; *accord* Tr. 386.

### B. Fogal

In April 2017, Fogal completed a medical source statement. Fogal noted that Plaintiff attended two appointments in August 2016 after which there were a number of no-shows and Plaintiff was not seen again until the completion of the medical source statement. Tr. 380; *see* Tr. 343 (note by Dr. Westin that Plaintiff "is applying for SSI disability based on mental health and has had paperwork signed and sent by . . . Fogal, who she has seen twice"). Fogal listed Plaintiff's diagnoses as depression, anxiety, and

situational stress.  Tr. 380.  Fogal stated that Plaintiff's prognosis was "poor-fair[,] depending on her [follow up with] counseling."  Tr. 380.  Fogal also stated that Plaintiff was not a malingerer.  Tr. 380.

Like Dr. Westin, Fogal also opined on Plaintiff's ability to sustain certain mental activities.  Fogal similarly opined that Plaintiff was moderately limited but could still function satisfactorily with respect to understanding and remembering very short and simple instructions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially-appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places or using public transportation.  Tr. 381.  Fogal also opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work-setting, thus less limited in this area than Dr. Westin opined.  Tr. 381.

With respect to areas where Plaintiff was markedly limited with a substantial loss in her ability to function effectively, Fogal likewise identified: remembering locations and work-like procedures; working in coordination with, or proximity to, others without being distracted by them; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; and setting realistic goals or making plans independently.  Tr. 381.  Fogal also opined that Plaintiff was markedly limited in her ability to maintain attention and concentration for more than two-hour segments and sustain an ordinary routine without special supervision, thus less limited in

these areas than Dr. Westin opined.  Tr. 381.  Fogal additionally opined, however, that Plaintiff was markedly limited in her ability to carry out very short and simple instructions, thus more limited in this area than Dr. Westin opined.

As for those areas where Plaintiff had extreme limitation, Fogal similarly identified performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances as well as completing a normal workday and work week, without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods.  Tr. 381. Compared to Dr. Westin's opinion of marked limitation, Fogal identified understanding, remembering, and carrying out detailed instructions and tolerating normal levels of stress as areas where Plaintiff had extreme limitation.  Tr. 381.

When asked if Plaintiff would require unscheduled breaks, Fogal checked "yes" and stated that he did not believe Plaintiff could cope with an eight-hour day "even [with] hourly breaks."  Tr. 382.  Fogal checked "no" when asked if Plaintiff's mental impairments were likely to produce good days and bad days.  Tr. 382.  Fogal listed Plaintiff's depression; lack of motivation and energy; and concentration and memory problems as additional limitations likely to interfere with her ability to sustain competitive employment.  Tr. 382.

### C. State Agency Psychological Consultants

The state agency psychological consultants assessed Plaintiff's ability to perform work activities the same both initially and on reconsideration.  *Compare* Tr. 68-69, 79-80 *with* Tr. 93-94, 104-05.  Each time, they found that Plaintiff was moderately limited in her

ability to understand, remember, and carry out detailed instructions, but otherwise not significantly limited. Tr. 68-69, 79-80, 93, 104-05.

At the initial determination, the first state agency psychological consultant opined that "[t]he evidence suggests that [Plaintiff] can understand, remember and carry[]out simple tasks." Tr. 69; *accord* Tr. 80. The first consultant further opined that Plaintiff "can relate on at least a superficial [level] and [sic] an ongoing basis with co-workers and supervisors"; "attend to task[s] for sufficient periods of time to complete tasks"; and "manage the stresses involved with simple work." Tr. 69; *accord* Tr. 80.

On reconsideration, the second state agency psychological consultant affirmed the prior findings. Tr. 94, 105. The second consultant additionally noted that Plaintiff had a long history of drug and alcohol abuse and cited inconsistencies with self-reporting. Tr. 94, 105. The second consultant further noted that Plaintiff admitted not taking her medication in September 2016 but reported compliance and improvement at her next appointment in November. Tr. 94, 105. Lastly, the second consultant noted that "[t]here are some inconsistencies throughout the [medical evidence] and the 12/2016 diagnostic assessment does make a note of possible malingering." Tr. 94; *accord* Tr. 105.

**D. Medical Expert**

Kevin Schumacher, Ph.D., L.P., served as the medical expert and completed both a medical source statement and a set of medical interrogatories.

### 1. Medical Source Statement

Beginning with the effect Plaintiff's impairments had on her ability to understand, remember, and carry out instructions, Schumacher opined there was no effect on Plaintiff's

ability to understand, remember, and carry out simple instructions or make judgments on simple work-related decisions.  Tr. 633.  Plaintiff's ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions was mildly affected by her impairments.  Tr. 633.  Schumacher explained that although Plaintiff "complains of poor concentration and memory, . . . there is little objective evidence of problems with those skills."  Tr. 633.  Schumacher noted that the neuropsychological evaluation showed "[s]ome deficits . . . but the examiner notes 'poor effort' during testing."  Tr. 633.

With respect to the effect Plaintiff's impairments had on her ability to get along with others and respond to changes in the work setting, Schumacher opined Plaintiff's ability to interact with the public was unaffected; her ability to interact appropriately with co-workers was mildly affected; and her ability to interact appropriately with supervisors and respond appropriately to usual work situations and changes in a routine work setting were moderately affected.  Tr. 634.  Schumacher explained that Plaintiff's depression and anxiety would "reduce her stress tolerance in work situations."  Tr. 634.

Schumacher also commented on "a diagnosis of malingering" and a notation of "'poor effort' during neuropsychological testing, both of which suggest[ed] that [Plaintiff] may overstate the level of impairment that she experiences."  Tr. 634.  Schumacher further commented that Plaintiff's marijuana use might "exclude her from certain jobs[,] but the usage was separate from [her] depression and anxiety."  Tr. 634.

### 2. Medical Interrogatories

In the interrogatories, Schumacher was asked to rate Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. 637. Schumacher opined that Plaintiff had no limitation interacting with others. Tr. 637. Schumacher further opined that Plaintiff had mild limitation in the other three areas. Tr. 637.

Schumacher recognized that Plaintiff's treating sources viewed her "as much more impaired" than he did. Tr. 637. Schumacher explained, however, that "there is a substantive question of symptom exaggeration" based on the medical evidence. Tr. 637. Schumacher also observed that Plaintiff had been "working consistently prior to 2016, although it is unclear from the record as to why she could not continue that [illegible] work. She has apparently gotten several jobs subsequently, but could not keep them, although once again the record is unclear why she could not keep them." Tr. 637.

## V. ALJ'S DECISION

The ALJ found and concluded that Plaintiff had the severe impairments of depression and anxiety, and that neither of these impairments when considered individually or in combination met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff had "the residual functional capacity to perform a full range of work at all exertional levels" with the following additional limitations: "understanding, remember and carrying out simple, routine tasks"; "occasional interaction with supervisors"; and "occasional changes in a routine work setting." Tr. 16. When

determining Plaintiff's residual functional capacity, the ALJ considered the opinions of Dr. Westin, Fogal, the medical expert, and the state agency psychological consultants, among others. *See* Tr. 20-22. The ALJ gave the opinions of Dr. Westin and Fogal "little weight in light of the treatment notes showing improvement with medication compliance and counseling therapy." Tr. 20. The ALJ additionally pointed out that "Fogal had not consistently seen [Plaintiff] for month[s] leading up to [his medical source statement]." Tr. 20. In relevant part, the ALJ gave the medical expert's opinion "great weight" as it was "supported by the longitudinal record documenting improvement with consistent medication management and therapy as well as the . . . secondary gain issues raised." Tr. 21. Similarly, the ALJ also assigned "great weight" to the opinions of the state agency psychological consultants as the limitations they identified were "consistent with the treatment notes documenting improvement with consistent medication management and ongoing therapy as well as" the assessment of the medical expert. Tr. 21.

When considering the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms, the ALJ addressed Plaintiff's work history. The ALJ recognized that Plaintiff's "earning records indicate [she] earned income at substantial gainful activity levels on a consistent basis in the years leading up to the alleged onset date." Tr. 20. The ALJ determined, however, that "[t]he probative weight of [Plaintiff's] good work history is eroded by notations of secondary[-]gain issues in the record." Tr. 20. The ALJ explained that Plaintiff

> has a good work history but she stopped working for reasons
> unexplained. At the hearing, she stated she had lost her last
> full[-]time job because she asked for assignment to another job

26

within the business and was denied due to gender
discrimination followed by termination and replaced with a
male. However, at the consultative examination,[10] she stated
she had been terminated from her last job because her employer
. . . believed she was using drugs. The record raises significant
concerns of secondary gain issues with her intake assessment
noting that [she] had endorsed the maximum on all self-
reporting scales while indicating she was going to apply for
disability benefits. Later, on psychological testing, [Plaintiff]
was noted to have given poor effort and failed 2 of 3 validity
measure[s] with significantly endorsed self-reporting
measures.

Tr. 22.

# VI. ANALYSIS

## A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence

in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he

threshold for such evidence is not high." *Id.* "It means—and means only—such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

(quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011)

("Substantial evidence means less than a preponderance but enough that a reasonable

person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the

[ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's

decision "will not [be] reverse[d] simply because some evidence supports a conclusion

---

[10] This appears to be a reference to the diagnostic assessment clinical interview performed by Springstead. *See* Tr.
356-57. There was no consultative examination in this case. *See* 20 C.F.R. §§ 404.1519a, 416.919a (consultative
examinations).

other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step
> process, considering whether: (1) the claimant was employed;
> (2) she was severely impaired; (3) her impairment was, or was
> comparable to, a listed impairment; (4) she could perform past
> relevant work; and if not, (5) whether she could perform any
> other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving

the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Residual Functional Capacity

Plaintiff's assignments of error concern the ALJ's determination of her residual

functional capacity.  A claimant's "residual functional capacity is the most [she] can still

do despite [her] limitations."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a); *see McCoy v.*

*Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity]

represents the most he can do despite the combined effects of all of his credible limitations

and must be based on all credible evidence.").  "Because a claimant's [residual functional

capacity] is a medical question, an ALJ's assessment of it must be supported by some

medical evidence of the claimant's ability to function in the workplace."  *Perks*, 687 F.3d

at 1092 (quotation omitted); *accord Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

"Medical records, physician observations, and the claimant's subjective statements about

his capabilities may be used to support the [residual functional capacity]."  *Perks*, 687 F.3d

at 1092.

"Even though the [residual-functional-capacity] assessment draws from medical

sources for support, it is ultimately an administrative determination reserved to the

Commissioner."  *Id.* (quotation omitted); *see* 20 C.F.R. §§ 404.1546(c), 416.946(c).  And,

"[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]."  *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016).

### 1. Weighing of the Opinion Evidence

Plaintiff argues the ALJ failed to analyze the opinions of her treating sources and the medical expert properly.  Plaintiff argues that the ALJ should have given controlling weight to Dr. Westin and Fogal and found her disabled based on the limitations they identified.

In determining whether a claimant is disabled, the ALJ considers medical opinions along with the other evidence in the record.  20 C.F.R. §§ 404.1527(b), 416.927(b); *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  The ALJ is tasked with resolving conflicts among the various medical opinions and "may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  *Wagner*, 499 F.3d at 848 (quotation omitted).  Regardless of its source, every medical opinion received is to be evaluated.  20 C.F.R. §§ 404.1527(c), 416.927(c); *Miller v. Colvin*, 784 F.3d 472, 478 (8th Cir. 2015).

### a. Treating Sources

There is no dispute that Dr. Westin and Fogal are acceptable medical sources who treated Plaintiff.  *See* 20 C.F.R. §§ 404.1502(a)(1), (2), 416.902(a)(1), (2) (identifying licensed physicians and psychologists as acceptable medical sources); .1527(a)(2), .927(a)(2) ("Treating source means your own acceptable medical source who provides you,

or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."). The opinions of such treating sources are "entitled to controlling weight when [they are] supported by medically acceptable techniques and . . . not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). "Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted). The opinions of treating sources "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Julin*, 826 F.3d at 1088 (opinions of treating physicians "may be given limited weight if they are . . . inconsistent with the record").

When a treating source's opinion is not given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). "Where an ALJ assigns less than controlling weight to the opinion of a treating source, the ALJ must give good reasons for doing so." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quotation omitted); *accord Cline*, 771 F.3d at 1103.

### i.    Consideration of the Relevant Factors

Plaintiff begins by arguing that although the ALJ "correctly identify[ed Dr. Westin and Fogal] as treating providers and acceptable medical sources," it is not clear that the ALJ considered all of the relevant factors when determining the weight to be given to their opinions, including Fogal's area of specialty as a psychologist; the fact that Dr. Westin and Fogal each examined Plaintiff; and the consistency of their opinions with each other.  Pl.'s Mem. in Supp. at 12-14, ECF No. 14.  Plaintiff argues that "the ALJ ignored without comment multiple § 404.1527 factors that favor crediting the opinions of Dr[.] Westin and Fogal."  Pl.'s Mem. in Supp. at 14.

**Recognition of the Relevant Factors.**  As stated above, §§ 404.1527 and 416.927 set forth the manner in which medical opinions are weighed, including that more weight is generally given to the opinions of treating and examining sources.   20 C.F.R. §§ 404.1527(c)(1), (2), 416.927(c)(1), (2).  Notably, the ALJ explicitly stated in the decision that the opinion evidence was considered "in accordance with the requirements of 20 CFR 404.1527 and 416.927."  Tr. 16.  *See Carlson v. Astrue*, 604 F.3d 589, 595 (8th Cir. 2010) (ALJ's citation to relevant regulation "tends to confirm that the ALJ recognized and applied the correct legal standard"); *see also Susan B.B. v. Berryhill*, No. 17-cv-5039 (ECW), 2018 WL 6834601, at *4 (D. Minn. Dec. 28, 2018).

**Fogal's Specialization.**  As for Fogal's status as a psychologist, more weight is generally placed "on the opinions of specialists over generalists where opinions conflict and evidence does not otherwise provide reasons for rejecting the specialist's opinion." *Noerper v. Saul*, 964 F.3d 738, 745 (8th Cir. 2020); *see* 20 C.F.R. §§ 404.1527(c)(5),

416.627(c)(5).  Plaintiff contends that "Fogal's specialty is not discussed or *acknowledged* in the ALJ's decision, so it is impossible to know how this weighed in the ALJ's mind." Pl.'s Mem. in Supp. at 13 (emphasis added).  When discussing Fogal's opinion, the ALJ stated that "the statements of [Plaintiff's] therapist, Ken Fogal, *L.P.*," were considered and that he was an acceptable medical source.  Tr. 20 (emphasis added).  It cannot reasonably be argued that the ALJ failed to acknowledge Fogal's status as a psychologist by employing an abbreviation rather than Fogal's full title, particularly when, in the very next sentence, the ALJ acknowledged that Fogal was an acceptable medical source.  *See* 20 C.F.R. §§ 404.1502(a)(2), 416.902(a)(2); *see also Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *5 (D. Minn. Mar. 15, 2018) ("Here, the ALJ's description was sufficient to indicate that she took into account the treating/examining relationship of the medical sources, as well as their specialties.").

**Examining Relationship.**  Greater weight is given to medical opinions of sources who have "examined [the claimant] than to . . . opinion[s] of . . . medical source[s] who ha[ve] not examined [the claimant]."  20 C.F.R. § 404.1527(c)(1); *accord* 20 C.F.R. § 416.927(c)(1).  Here too, Plaintiff argues that "the ALJ gave no obvious consideration to the fact that [Dr. Westin and Fogal] have actually *examined* Plaintiff on multiple occasions."  Pl.'s Mem. in Supp. at 13.  But, as the Commissioner points out, "the ALJ discussed several of Dr. Westin's examinations in detail" when recounting the medical evidence, thus clearly considering the examining relationship.  Comm'r's Mem. in Supp. at 8, ECF No. 17.  The ALJ discussed these examinations as visits Plaintiff had with her "primary care provider," i.e., Dr. Westin, with citations to the record demonstrating that

the ALJ took into account the fact that Dr. Westin examined Plaintiff multiple times.  *See*

Tr. 18-19.  Given the ALJ's discussion of the findings and observations from Plaintiff's

visits with Dr. Westin, it is "highly unlikely" the ALJ was oblivious to the existence of an

examining relationship.  *Cf.  Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).

Similarly, the ALJ described Plaintiff's session in early August with her "therapist,"[11] i.e.,

Fogal, and his findings and observations, again with citations to the record demonstrating

that the ALJ also took into account the fact that Fogal examined Plaintiff.  Tr. 18.

      In any event, the regulations do not require the ALJ to *discuss* each factor, only that

the factors be considered and the ALJ give "good reasons" for the weight assigned to the

opinion of a treating source.  20 C.F.R. §§ 404.1527(c), 416.927(c); *Chesser*, 858 F.3d at

1164; *Cline*, 771 F.3d at 1103; *Roesler v. Colvin*, No. 12-cv-1982 (JRT/JJK), 2013 WL

4519388, at *5 (D. Minn. Aug. 26, 2013) ("But the regulations do not strictly require the

ALJ to explicitly discuss each factor. Rather, the regulations assure that the ALJ will

always give good reasons for the weight given to a treating physician's opinion.")

(quotation omitted).  Indeed, this vein of argument—that the ALJ must meticulously step

through each of the factors—has been repeatedly rejected in this District.  *See, e.g.*, *Patrick

M. B. v. Saul*, No. 18-cv-2569 (TNL), 2020 WL 1515380, at *9 (D. Minn. Mar. 30, 2020);

*Curtis E. v. Saul*, No. 18-cv-02577 (HB), 2019 WL 5901117, at *5 (D. Minn. Nov. 12,

2019); *Edward W. v. Saul*, No. 18-cv-2175 (ECW), 2019 WL 4242576, at *18 (D. Minn.

Sept. 6, 2019); *Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 (D.

---

[11] The ALJ also referred to Springstead as Plaintiff's "therapist" on a number of occasions.  *See* Tr. 18-19.  The pertinent reference ("Ex. 1F, pg. 15"), however, is to a progress note written by Fogal.  *See* Tr. 341-42.

Minn. Mar. 19, 2018); *Mapson v. Colvin*, No. 14-cv-1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015).

Ultimately, "[w]hether granting a treating [source's] opinion substantial or little weight, the [ALJ] must always give good reasons for the weight she gives." *Cline*, 771 F.3d at 1103 (quotations omitted). To that end, the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Social Security Ruling 96-2p, *Titles II & XIV: Giving Controlling Weight to Treating Source Medical Opinions*, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-2p];[12] *see Edward W.*, 2019 WL 4242576, at *18; *Kuikka*, 2018 WL 1342482, at *5. Accordingly, the Court turns to whether the ALJ supplied the requisite good reasons for the weight assigned to the opinions of Dr. Westin and Fogal.[13]

### ii. Reasons for Weight Assigned to Opinions of Dr. Westin & Fogal

The ALJ gave "little weight" to the opinions of Dr. Westin and Fogal as their opinions were inconsistent with "treatment notes showing improvement with medication compliance and counseling therapy." Tr. 20. The ALJ additionally noted that "Fogal had not consistently seen [Plaintiff] for month[s] leading up to those statements." Tr. 20.

---

[12] Plaintiff's applications were filed before March 27, 2017.
[13] The Court will return to Plaintiff's argument that the ALJ failed to consider the consistency of their opinions with each other in a moment. *See infra* Section VI.B.1.a.ii.

Plaintiff argues that the reasons given by the ALJ are "legally insufficient and/or factually inaccurate." Pl.'s Mem. in Supp. at 15.

**Degree of Limitation Inconsistent with Treatment Notes.** Plaintiff asserts that, as the only treating and examining medical sources, Dr. Westin and Fogal's treatment notes are necessarily encompassed within their opinions. According to Plaintiff, it therefore follows that the ALJ's finding that the opinions of her treating sources were inconsistent with their treatment notes amounts to "an impermissible substitution of the ALJ's lay opinion for that of the provider." Pl.'s Mem. in Supp. at 15.

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight . . . will [be] given to that medical opinion." 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). It is well established that an ALJ may discount the opinion of a treating source when it is inconsistent with the source's own treatment notes. *See, e.g.*, *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes.") (quotation omitted); *see also, e.g.*, *Cline*, 771 F.3d at 1104; *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013); *Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008); *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006); *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Plaintiff is correct that the determination of her residual functional capacity "must be based on [her] ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy*, 648 F.3d at 617 (quotation omitted). But, she provides no authority in support of her assertion that "[i]t is patently improper to find a

treating provider's opinion regarding how a claimant would function in the context of performing an [eight]-hour a day job on a regular and continuing basis defective on the basis the claimant may appear more functional during office visits . . . ."  Pl.'s Mem. in Supp. at 16.

The thrust of Plaintiff's argument is that she disagrees with the ALJ's conclusion that the evidence in the record showed overall improvement with medication and counseling.  Acknowledging there were times she was noted to have an improved mood and benefitted from medication, Plaintiff points out that she continued to experience anxiety and depression; struggled with situational stressors; and reported problems with memory, concentration, and motivation.

The Eighth Circuit Court of Appeals has "recognize[d] that it is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased."  *Mabry v. Colvin*, 815 F.3d 386, 392 (8th Cir. 2016) (quotation omitted).  "Because individuals with a mental illness may experience periods during which they are relatively symptom-free, their level of functioning can vary significantly over time."  *Id.*  At the same time, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Id.* at 391-92 (quotation omitted); *accord  Cronin v. Saul*, 945 F.3d 1062, 1068 (8th Cir. 2019) ("Conditions that are controlled with treatment are not considered disabling.").

Plaintiff is essentially asking this Court to reweigh the medical evidence.  As the ALJ pointed out, there were times Plaintiff presented to her treatment providers more disheveled, distressed, and anxious and her fidgeting and stuttering were more pronounced.

37

But, although Plaintiff had periods in which she was more symptomatic, the ALJ also correctly observed that Plaintiff's symptoms improved when she was regularly taking her medication and seeking treatment. *See Mabry*, 815 F.3d at 392. Further, to the extent Plaintiff relies on high PHQ-9 and GAD-7 scores, the ALJ accurately pointed out that the reliability of these scores and other performance measures were called into question on more than one occasion by other evidence suggesting Plaintiff's symptoms were not as severe as alleged and she may be malingering. *See* 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (consideration of any other factors "which tend to support or contradict the medical opinion").

Similarly, the ALJ appropriately highlighted the situational nature of Plaintiff's symptoms. *See* 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). The ALJ noted that Plaintiff "complained of increased anxiety secondary to her home being foreclosed upon" and "reported having some depression due to losing her home." Tr. 18. Plaintiff "appeared to be doing better," however, once she "was living in a new place and was in a committed relationship." Tr. 18. The Court appreciates that, at times, Plaintiff was a under a significant amount of stress related to her finances, home foreclosure, and personal relationships. While these sorts of stressors are undoubtedly difficult, the ALJ properly considered the situational variance of the intensity, persistence, and limiting effects of Plaintiff's symptoms when determining the weight to be given to the disabling limitations identified by Dr. Westin and Fogal. *See Joseph P. v. Berryhill*, No. 18-cv-291 (ECT/LIB), 2019 WL 3948861, at *12 (D. Minn. May 13, 2019) ("The situational nature of Plaintiff's mental health impairments undermines the weight to be assigned to CNS Eissinger['s]

38

highly debilitating medical statement."); *Christina L. v. Berryhill*, No. 17-cv-4627, 2019 WL 917176, at *3 (D. Minn. Feb. 25, 2019); *see also Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("The medical record supports the conclusion that any depression experienced by Gates was situational in nature, related to marital issues, and improved with a regimen of medication and counseling."); *cf. Dunahoo v. Apfel*, 241 F.3d 1033, 1040-41 (8th Cir. 2001).

It is not surprising that Plaintiff is able to point to some evidence in the record supporting the greater limitations identified by Dr. Westin and Fogal. *See Mabry*, 815 F.3d at 392. An ALJ's decision may not be reversed, however, simply because the reviewing court "may have reached a different conclusion . . . or because substantial evidence supports a contrary conclusion." *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (quotation omitted); *see, e.g.*, *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016); *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). Here, the ALJ properly took into account whether the disabling limitations identified by Dr. Westin and Fogal were consistent with the evidence in the record as a whole, 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). That Plaintiff's symptoms may have waxed and waned "do[es] not undermine the ALJ's overall finding that Plaintiff's symptoms improved with treatment," particularly considering that her treatment providers questioned with some regularity the accuracy of her reporting. Comm'r's Mem. in Supp. at 13. Substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments did not limit her ability to perform work-related activities to the degree opined by Dr. Westin and Fogal based on treatment notes showing improvement with medication and counseling, and  the ALJ permissibly assigned less

weight to their opinions as a result. *See Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) ("ALJ can accord . . . less weight" to opinion of treating source that "is inconsistent with or contrary to the medical evidence as a whole") (quotation omitted); *see also Susan B.B.*, 2018 WL 6834601, at *5.

> **Frequency of Examination.**  Although not entirely clear, Plaintiff appears also to take issue with the ALJ considering the fact that Fogal "had not consistently seen [Plaintiff] for month[s] leading up to [his opinion]" when determining what weight to assign.  Tr. 20; *see* Pl.'s Mem. in Supp. at 15.  In deciding the weight to be given to a medical opinion, the regulations require the ALJ to consider the "[l]ength of the treatment relationship and the frequency of examination."   20 C.F.R.  §  404.1527(c)(2)(i);  *accord* 20 C.F.R.  § 416.927(c)(2)(i).  Generally speaking, "the longer a treating source has treated [a claimant] and the more times [a claimant] has been seen by a treating source," the more weight that treating source's opinion will be given.  20 C.F.R. § 404.1527(c)(2)(i); *accord* 20 C.F.R. § 416.927(c)(2)(i).  This is a logical corollary to the principle that treating "sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."   20 C.F.R.  §  404.1527(c)(2);  *accord* 20 C.F.R.  § 416.927(c)(2).   To the extent Plaintiff contends the ALJ erred by considering the infrequency with which Plaintiff saw Fogal when determining the weight to be assigned to his opinion, this argument is unavailing.

**Consistency of Opinions.** The Court returns now to Plaintiff's argument that the ALJ "considered [Dr. Westin and Fogal's] opinions in isolation from each other, without acknowledging that they support each other in agreeing that [her] ability to perform full-time work is more compromised by her impairments" than reflected in the ALJ's residual-functional-capacity determination. Pl.'s Mem. in Supp. at 14. Plaintiff argues "[t]hat the assessments of independent sources confirm each other's conclusions is compelling and highly probative evidence [that] cannot be reasonably denied based on general principles." Pl.'s Mem. in Supp. at 14. Because the regulations require the ALJ to look at the consistency of a medical opinion with the record as a whole when determining the weight to be assigned to that opinion, *see* 20 C.F.R. 404.1527(c)(4), 416.927(c)(4), Plaintiff argues that "[t]he ALJ's failure *to acknowledge, no less discuss*, the consistency between [the opinions of Dr. Westin and Fogal] as a factor that favors crediting [them] is clear error . . . ." Pl.'s Mem. in Supp. at 14.

Again, as stated above, there is no requirement that the ALJ explicitly expound on each of the factors in §§ 404.1527 and 416.927. *See supra* Section VI.B.1.a.i. In any event, the ALJ observed that Dr. West and Fogal each opined that Plaintiff had "marked to extreme limitations in mental work-related abilities"; would need additional breaks; and would have difficulty with full-time work. Tr. 20.

More importantly, Plaintiff's argument that the ALJ did not expressly state that Dr. Westin and Fogal's opinions were consistent with *each other* reads the consistency factor much too narrowly. The fact that two treating sources have opined a similar degree of limitation may well be compelling and entitled to controlling weight when those opinions

41

are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the *other substantial evidence*" in the record. 20 C.F.R. § 404.1527(c)(2); *accord* 20 C.F.R. § 416.927(c)(2). But, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source . . . if it is inconsistent with other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, at *2. In this case, although Dr. Westin and Fogal's opinions were largely consistent with each other, the ALJ properly focused on the more probative—and indeed, dispositive—fact that their opinions were not consistent with other substantial evidence in the record. *See* SSR 96-2p, 1996 WL 374188, at *2; *see, e.g.*, *Julin*, 826 F.3d at 1088; *Stormo*, 377 F.3d at 806.

### b.  Medical Expert

Plaintiff also challenges the ALJ's treatment of Schumacher's opinions.

### i.  Secondary Gain

First, Plaintiff contends that the ALJ repeatedly "imposed the words 'secondary gain'" on Schumacher's opinions "when in fact no such words were ever stated by him." Pl.'s Mem. in Supp. at 29. Plaintiff argues that "[b]oth [Schumacher] and the ALJ either failed to read the entire [neuropsychological] report or simply did not accurately recount the findings." Pl.'s Mem. in Supp. at 29. Plaintiff argues "[t]he notion of secondary gain . . . is not support at all in the full reading of the record." Pl.'s Mem. in Supp. at 30.

In recounting the medical evidence, the ALJ pointed to places in the record suggesting that Plaintiff may be financially motivated to qualify for benefits, which the ALJ termed "secondary gain issues." *See, e.g.*, Tr. 19 ("notations to secondary gain

issues").   The ALJ noted that Plaintiff told Springstead "that she was trying to get her late husband's Social Security and was also applying for disability" and had been diagnosed with malingering.   Tr. 18; *see* Tr. 356; *see, e.g.*, Tr. 358-59.   The ALJ also noted the neuropsychological examiner's comment that Plaintiff's deficient performance could be attributable to secondary gain, among other things.   Tr. 19; *see* Tr. 628.   Combined with the unclear basis as to precisely why Plaintiff stopped working, the ALJ concluded that "[t]he record raises significant concerns of secondary gain issues."   Tr. 22.

Plaintiff is correct that Schumacher did not expressly use the term "secondary gain." Rather, Schumacher highlighted the neuropsychological examiner's comment, the diagnoses of malingering, and the ambiguity regarding the reason Plaintiff stopped working as evidence to support his opinion that "there is a substantive question of symptom exaggeration."   Tr. 637.   Thus, as the Commissioner points out, Schumacher "clearly considered evidence that Plaintiff's poor effort during testing was attributable to secondary gain motivation."   Comm'r's Mem. in Supp. at 17.   When evaluating the weight to be given to Schumacher's opinion, the ALJ pointed out that Schumacher "noted the secondary g[a]in issues raised in the record" and assigned great weight to his opinion because it was "supported by the longitudinal record documenting improvement with consistent medication management and therapy as well as the . . . secondary gain issues raised."   Tr. 21.

It is true that "all disability claimants are financially motivated to some extent." *Ramirez v. Barnhart*, 292 F.3d 576, 583 n.4 (8th Cir. 2002).   Nevertheless, the ALJ may consider evidence of financial motivation and secondary gain.   *See, e.g.*, *id.*; *Gaddis v.*

*Chater*, 76 F.3d 893, 895-96 (8th Cir. 1996). In a related vein, the ALJ may also consider evidence indicating a claimant has "le[ft] work for reasons other than her medical condition[s]." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). Here, there is substantial evidence to support the ALJ's conclusion that Plaintiff was financially motivated to qualify for benefits. Schumacher cited the same "secondary gain" evidence as the ALJ to explain why his opinion departed significantly from the opinions of Plaintiff's treating sources, albeit without use of the term "secondary gain." The ALJ did not err by referring collectively to Schumacher's articulation of these issues as raising issues of secondary gain even though Schumacher himself did not use the term. It was proper for the ALJ to consider the consistency of Schumacher's opinion, including the secondary gain issues, with the record as a whole. *Cf. Chaney*, 812 F.3d at 677; *Gaddis*, 76 F.3d at 895-96.

### ii.    Limitation on Interactions with Others

Second, Plaintiff argues that the ALJ did not fully address the degree to which Schumacher limited her interaction with others. In addressing Plaintiff's ability to interact with others, Schumacher opined that Plaintiff had moderate limitation in her ability to interact appropriately with supervisors, meaning that her "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is *fair*." Tr. 633 (emphasis added). Schumacher additionally opined that Plaintiff had no limitation in her ability to interact with the public and mild limitation in her ability to interact with coworkers, meaning her functioning in these areas was at most "*slightly limited*." Tr. 633 (emphasis added); *see* Tr. 637. In response to the interrogatories, Schumacher similarly

opined that Plaintiff was "able to deal with superficial exchanges between herself, coworkers, supervisors and the public." Tr. 640. When determining Plaintiff's residual functional capacity, the ALJ limited Plaintiff "to occasional interaction with supervisors." Tr. 16. Plaintiff contends that, because Schumacher included coworkers and the public along with supervisors in the category of people with whom Plaintiff should be limited to superficial interactions, the ALJ was required to explain why coworkers and the public were not also included in the residual-functional-capacity determination.

Plaintiff herself acknowledges that an ALJ need not wholesale adopt or reject a medical opinion and "may properly accept some portions of a medical opinion while rejecting others." Pl.'s Mem. in Supp. at 31. The Eighth Circuit has explained that "there is no requirement that [a residual-functional-capacity] finding be supported by a specific medical opinion." *Hensley*, 829 F.3d at 932. Thus, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Mabry*, 815 F.3d at 390. Assuming for sake of argument that the ALJ should have specifically articulated why the limitation to occasional interaction with others applied only to supervisors and not coworkers and the public as well, any error was harmless. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred.").

45

As the Commissioner points out, the ALJ limited Plaintiff to unskilled work. Tr. 16. "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling 83-15, *Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments*, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1, 1985). "A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.* "These jobs ordinarily involve dealing primarily with objects, rather than with data or people . . . ." *Id.*

The ALJ found that Plaintiff was able to perform her past relevant work as a housekeeper (DOT 323.687-014) and, alternatively, the jobs of hospital cleaner (DOT 323.687-010); hand packager (DOT 920.587-018); and laundry worker (DOT 361.685-018). Tr. 22-24. The *Dictionary of Occupational Titles* ("DOT") rates the degree to which these jobs require a person to function in relation to other people. *See generally* DOT app. B (explanation of data, people, and things), *available at* https://occupationalinfo.org/appendxb_1.html. The rating scale ranges from 0 to 8, with 8 being the lowest level of functioning required. *Id.* A people rating of 8 involves "taking instructions" and "helping," and requires "attending to the work assignment instructions or orders of [a] supervisor" with "[n]o immediate response required unless clarification of instructions or orders is needed." *Id.* As one court has observed, a people rating of 8 does not "require a continued or even frequent interaction with individuals." *Flaherty v. Halter*, 182 F. Supp. 2d 824,

851 (D. Minn. 2001).  Each of the jobs identified by the ALJ carries a people rating of 8 and indicates that this is "not [a] significant" function.  DOT §§ 323.687-014, 1991 WL 672783 (housekeeper); 323.687-010, 1991 WL 672782 (hospital cleaner); 920.587-018, 1991 WL 687916 (hand packager); 361.685-018, 1991 WL 672987 (laundry worker).

Plaintiff's assertion of error is limited to challenging the absence of an explanation. Plaintiff does not contend that, should the ALJ have included a limitation on occasional interactions with coworkers and/or the public as well as supervisors that there would be any impact on the availability of the jobs identified by the ALJ.  Thus, while it may have been preferable for the ALJ to have addressed why the occasional-interaction limitation applied only to supervisors, this Court need not set aside the ALJ's decision on account of "an arguable deficiency in opinion-writing technique . . . when that deficiency had no bearing on the outcome."  *Owen*, 551 F.3d at 801; *see Byes*, 687 F.3d at 917.

### 2.  Work History

Finally, Plaintiff argues that she has a "stellar work history" demonstrated by "26 consecutive years of work."  Pl.'s Mem. in Supp. at 34.  Plaintiff "argues (1) the ALJ was required to consider this highly relevant credibility factor, and (2) did not."  Pl.'s Mem. in Supp. at 35.  Plaintiff argues that her "lengthy work history is a factor that lends to her credibility, not detracts from it" and "[t]he ALJ plainly erred . . . [by] fail[ing] to consider it at all."  Pl's Mem. in Supp. at 35.

A claimant's work history is one of many factors to consider when evaluating the intensity, persistence, limiting effects of a claimant's symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (considering all evidence presented "including

information about [a claimant's] prior work record"); *see, e.g.*, *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019); *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019); *see generally* Social Security Ruling 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304 (Soc. Sec. Admin. Oct. 25, 2017). While a lengthy work history can support allegations of disability, *see, e.g.*, *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998), "it is not outcome-determinative," *Kellie Ann C. v. Saul*, No. 19-cv-13 (KMM), 2020 WL 128451, at *6 (Jan. 10, 2020) (citing *Bryant v. Colvin*, 861 F.3d 779, 782-83 (8th Cir. 2017)). Nor is an ALJ required to discuss each of the factors that may bear on the ALJ's consideration of the intensity, persistence, limiting effects of a claimant's symptoms. *See, e.g.*, *Schwandt*, 926 F.3d at 1012.

Plaintiff's contention that the ALJ failed to consider her work history "at all," Pl.'s Mem. in Supp. at 35, is contradicted by the record. At step four, the ALJ explained:

> The undersigned has considered [Plaintiff's] earnings history. A review of [Plaintiff's] earnings record indicate[s she] earned income at substantial gainful activity levels on a consistent basis in the years leading up to the alleged onset date. The probative weight of the [Plaintiff's] good work history is eroded by notations of secondary gain issues in the record.

Tr. 20 (citations omitted); *see* Tr. 22. The ALJ additionally explained that the probative value of Plaintiff's lengthy work history was also diminished because "she stopped working for reasons unexplained." Tr. 22.

The evaluation of the intensity, persistence, and limiting effects of a claimant's symptoms is "the province of the ALJ." *Julin*, 826 F.3d at 1086; *accord Nash v. Comm'r*, 907 F.3d 1086, 1090 (8th Cir. 2018). So long as the ALJ's evaluation is supported by good

reasons and substantial evidence, courts will defer to the ALJ, who is in a better position to make such evaluations and resolve conflicts in the evidence. *Nash*, 907 F.3d at 1090; *see Julin*, 826 F.3d at 1086; *see also Swink*, 931 F.3d at 771. As stated above, the ALJ properly considered evidence of Plaintiff's financial motivation to qualify for benefits and the fact that she quit working for reasons other than her impairments. There is substantial evidence to support the ALJ's conclusion that other evidence in the record outweighed Plaintiff's lengthy work history when considering the intensity, persistence and limiting effects of her symptoms. *See Adkins v. Commissioner*, 911 F.3d 547, 550 (8th Cir. 2018); *Bryant*, 861 F.3d at 782; *Kellie Ann C.*, 2020 WL 128451, at *6.

## VII. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 13, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: September__29__, 2020            _____*s/ Tony N. Leung*_____
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        District of Minnesota


                                        *Rachelle A. S. v. Saul*
                                        Case No. 19-cv-1742 (TNL)